FILED

2020 Apr-23  AM 08:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| **PORSHA PRIDE-FORT,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  3:17-cv-01203-MHH** |
| } | |
| **NORTH AMERICAN LIGHTING,** } | |
| } | |
| **Defendant.** } | |
| } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on defendant North American Lighting's motion for summary judgment.  (Doc. 32).  In her amended complaint, plaintiff Porsha Pride-Fort asserts claims against North American Lighting for discrimination on the basis of race under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; discrimination on the basis of a disability under the Americans with Disabilities Act, 42 U.S.C. § 12102; retaliation under Title VII and the ADA; and interference and retaliation under the Family Medical Leave Act, 29 U.S.C. § 2601 et seq.  NAL has asked the Court to enter judgment in its favor on all of Ms. Pride-Fort's claims.  This opinion resolves NAL's summary judgment motion.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018).

"'If the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp Art, Inc. v. U.S. Postal Service,* 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Martin v. Alamo Community College Dist.,* 353 F.3d 409, 412 (5th Cir. 2003)).

# BACKGROUND

North American Lighting manufacturers automotive headlights and taillights, and employs approximately 1,300 people at its Muscle Shoals, Alabama facility. (Doc. 31-4, ¶ 4). Ms. Pride-Fort is a black female. (Doc.31-2, p. 41). She began working as a temporary employee for North American Lighting in August 2010, and North American Lighting hired her as a full-time assembly operator in January 2011. (Doc. 31-1, pp. 73–75).

By 2014, Ms. Pride-Fort was a team leader on the day shift. She was one of two black team leaders at NAL's Muscle Shoals facility. (Doc. 31-1, p. 87). The other black team leader was Thomas Goode. (Doc. 31-1, p. 88). On January 19, 2014, Ms. Pride-Fort asked for a transfer because she felt that Jennifer Howell, another employee in her department, was harassing her. (Doc. 31-1, p. 85; Doc. 31-2, p. 37). Ms. Pride-Fort testified that Ms. Howell was "constantly standing over" her, "watching [her] every move," and "call[ing] [her] literally constantly all day long over the radio and just having [her] doing unnecessary stuff." (Doc. 31-1, p. 86). Ms. Pride-Fort stated that Ms. Howell "didn't like [her] because [she] was black." (Doc. 31-1, p. 87).[1] Ms. Pride-Fort was transferred to a new department;

---

[1] Over the years that Ms. Pride-Fort and Ms. Howell worked in the same department, Ms. Howell sometimes supervised Ms. Pride-Fort. (Doc. 31-1, pp. 87, 89). Ms. Pride-Fort testified that Mr. Goode also believed that Ms. Howell and another employee harassed him because of his race. (Doc. 31-1, p. 88).

3

the record identifies the old and new departments by number but not by name. (Doc. 31-2, p. 37). From the time of her transfer in February 2014 to her termination in September 2015, Ms. Pride-Fort's supervisors were white males. (Doc. 31-1, p. 94–97).

Immediately after her transfer, Ms. Pride-Fort reported to Eric Bush, the general foreman of her new department. (Doc. 31-1, p. 91–92). According to Ms. Pride-Fort, Mr. Bush referred to her and other black employees as "y'all people." (Doc. 31-1, p. 101). Ms. Pride-Fort reports that sometime in 2014 or early 2015, Mr. Bush said to a group of black women, "y'all need to go to church." (Doc. 31-1, p. 101). In that same timeframe, Mr. Bush stated that a group of mostly black female employees "would get along just fine" with Ms. Howell because "[a]ll of y'all are . . . bitchy." (Doc. 31-1, p. 101).

Eventually, Hans Pell became Ms. Pride-Fort's supervisor, and she reported to him for a few months until she took FMLA leave in April 2015. (Doc. 31-1, p. 94–95). According to Ms. Pride-Fort, Mr. Pell excluded her from meetings, clapped or whistled to get her attention, "sabotage[ed] [her] lines," and accused her of wrongdoing to try to get her fired. (Doc. 31-1, p. 98). Ms. Pride-Fort states that Mr. Pell treated her differently from other team leaders. In one instance, a black operator, Erica Lynch, "got in [Ms. Pride-Fort's] face and she made threats and she cursed" at

Ms. Pride-Fort in front of Mr. Pell.  (Doc. 31-1, pp. 111–13).  According to Ms. Pride-Fort, Mr. Pell did nothing in response.  (Doc. 31-1, p. 112).

Similarly, a supervisor took no action when he saw Brenda Hamilton, a black team leader, "put her hands on" Ms. Pride-Fort.  (Doc. 31-1, pp. 108–10).  Ms. Pride-Fort reported the incident to Kim Goldstein, a human resources representative. Ms. Goldstein sent Ms. Hamilton home.  (Doc. 31-1, p. 110).  When Ms. Hamilton later put her hands on a white employee, NAL terminated Ms. Hamilton.  (Doc. 31-1, pp. 108–09).  Ms. Pride-Fort testified that NAL management supported white team leaders and acted on their complaints, but management did not support her because management wanted her to look bad.  (Doc. 31-1, pp. 150–51).

Ms. Pride-Fort recalls that before she took FMLA leave in April 2015, she complained to human resources about both the Hamilton and Lynch incidents and about Mr. Bush and Mr. Pell's conduct.  (Doc. 31-1, p. 115).   According to Ms. Pride-Fort, she last spoke to Ms. Goldstein about racial discrimination or harassment in April 2015 when she complained about Ms. Lynch's threats and Mr. Pell's inaction.  (Doc. 31-1, p. 141).

On April 20, 2015, Ms. Pride-Fort completed and submitted to the EEOC a civil rights discrimination complaint.  (Doc. 31-2, p. 63).  Ms. Pride-Fort identified Eric Bush, Hans Pell, and NAL's human resources department as the NAL

employees who allegedly discriminated against her.   (Doc. 31-2, p. 63).   Ms.

Pride-Fort stated:

> I was a victim and subjected to discrimination by upper management. I was often being treated differently from my fellow team leaders. I was physically and verbally threatened by other employees. Upper management witnessed these threats and allowed me to work in a hostile environment. I was harassed. My life was put in jeopardy and caused me serious health issues.

(Doc. 31-2, p. 63).

On April 20, 2015, Ms. Pride-Fort took FMLA leave to recover from shingles.

(Doc. 31-1, pp. 209–10; Doc. 31-2, p. 53).   Ms. Pride-Fort's doctor released her to

return to work on July 13, 2015.   (Doc. 31-1, p. 165, 168; Doc. 31-2, pp. 52–53).

When she returned from FMLA leave, Ms. Pride-Fort was assigned to a new area

under a new supervisor, Ronnie Bowling.   (Doc. 31-1, pp. 115, 141).   Ms. Pride-Fort

does not contend that Mr. Bowling or the supervisors that succeeded him, Andrew

Watkins and Stephen Speake, harassed or discriminated against her.   (Doc. 31-1, p.

97).   Ms. Pride-Fort resumed her position as team leader.   (Doc. 31-1, p. 172).   She

did not request an accommodation, and she worked without medical concerns until

September 2015.   (Doc. 31-1, p. 166, 212, 223–24; Doc. 31-2, p. 62).

On September 10, 2015, Ms. Pride-Fort felt badly at work.   A NAL supervisor

sent her home.   Ms. Pride-Fort returned to work the following day, but she felt dizzy,

so she left work to see her doctor.   (Doc. 31-1, pp. 151–52; Doc. 31-2, p. 62).   When

she visited her doctor, Ms. Pride-Fort complained of stomach pain, high blood

pressure, and dizziness.  (Doc. 31-3, p. 4).  Her doctor diagnosed abdominal pain.  (Doc. 31-4, p. 6).

Ms. Pride-Fort completed FMLA paperwork for the September 2015 absences, and NAL initially coded the absences as FMLA leave.   (Doc. 31-1, p. 152; Doc. 40-1, pp. 3–4).  On September 17, 2015, HR notified Ms. Pride-Fort's supervisor, Stephen Speake, that Ms. Pride-Fort had exhausted her FMLA leave for 2015 and was ineligible to use FMLA to cover the September absences.  (Doc. 40-1, p. 4).  NAL did not allow Ms. Pride-Fort to use accumulated vacation time to cover the absences.  (Doc. 31-2, p. 60; Doc. 31-5, ¶ 9; Doc. 31-1, p. 184).[2]

Because NAL did not excuse Ms. Pride-Fort's September absences, she accumulated 7.5 points on her attendance record for unexcused absences, and NAL terminated her, per NAL's attendance policy, for having more than 7 points.  (Doc. 31-5, p. 3, ¶¶ 5–6; Doc. 40-1, pp. 2–3).  Ms. Pride-Fort's termination report, signed by her supervisor Stephen Speake, states:  "Porsha pointed out at 7.5 points due to thinking it would be covered under FMLA."  (Doc. 40-1, p. 2).  Ms. Pride-Fort stated

---

[2] On August 15, 2015, NAL issued a memo reminding employees of NAL's holiday shutdown policy.  (Doc. 31-2, p. 60).   NAL planned to shut down its operations from December 28, 2015 to December 31, 2015.  Under the holiday shutdown policy, all employees who had fewer than 32 hours of paid time available were not eligible to use that paid time after September 1, 2015.  (Doc. 31-2, pp. 60-61).  The policy was designed to ensure that employees who were not selected to conduct inventory during the annual plant shutdown at the end of the year, work for which the inventory employees were paid, would receive pay during the shutdown.  (Doc. 31-4, p. 4).  As of September 1, 2015, Ms. Pride-Fort had fewer than the 32 hours of paid time available.

that she "was not aware of [her] points until [she] was fired," and, under NAL policy, she should have received a letter when she reached four points.  (Doc. 31-2, p. 62).

HR employee Kathleen Heneghan notified Ms. Pride-Fort of her (Ms. Pride-Fort's) termination.  (Doc. 40-1, p. 2; Doc. 31-1, p. 184).  Ms. Pride-Fort testified that she told Ms. Heneghan that she should be permitted to use her vacation time because the holiday shutdown policy did not apply to team leaders, and Mr. Bush confirmed that she could use earned vacation time, but she was terminated nonetheless.  (Doc. 31-1, pp. 184-85).

On October 20, 2015 Ms. Pride-Fort filed a formal charge with the EEOC alleging discrimination based on race, retaliation, and "other" conduct occurring between April 9, 2015 and September 3, 2015.  (Doc. 31-2, p. 38).  Ms. Pride-Fort alleged:

> I am being subjected to discrimination by upper management. I am treated differently from my fellow team leaders. I was physically and verbally threatened by other employees. Upper management witnessed these threats but took no corrective actions. I was threatened and intimidated by Carli Sanders, AGM, and accused of alienating Heather B. I have talked to Heather about work related issues only, not my personal life, which is off limits to anyone who has slandered me to management personnel and/or co-workers. I was told by Ms. Sanders that if I discussed this matter or took it out on my operators, she would personally escort me out the door.

(Doc. 31-2, p. 38).

# ANALYSIS

## ADA Discrimination

Ms. Pride-Fort asserts that NAL violated her rights under the ADA by denying her a reasonable accommodation and discharging her in September 2015 because NAL regarded her as suffering from shingles, a disabling condition.  Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to ... the hiring, advancement, or discharge of employees [or] other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that at the time of the adverse employment action, (1) she had a disability or her employer regarded her as having a disability, (2) she was a qualified individual who was able to perform the "essential functions" of the job "with or without reasonable accommodation," and (3) she was subjected to unlawful discrimination because of the perceived disability.  *United States Equal Employment Opportunity Comm'n v. St. Joseph's Hospital, Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016) (citing *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007)); *Davis v. Fla Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).  "The term 'disability' means, with respect to an individual – (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment...; or (C) being regarded as having such an impairment..."  42

U.S.C. § 12102(1).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2).

"To prove a 'regarded as' disabled claim, [a plaintiff] must 'establish[] that [s]he has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment . . . .'"  *Snider v. U.S. Steel-Fairfield Works Med. Dep't*, 25 F. Supp. 3d 1361, 1366 (N.D. Ala. 2014), *aff'd*, 591 Fed. Appx. 908 (11th Cir. 2015) (quoting 42 U.S.C. § 12102(3)(A)) (internal ellipsis omitted).  In the ADA Amendments Act of 2008, Congress expanded the "regarded as" prong of the definition of disability so that a person now may be regarded as having an impairment "whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3).

Ms. Pride-Fort was terminated after NAL sent her home from work on September 10, 2015 and she left work on September 11, 2015.  On September 10, 2015, Ms. Pride-Fort experienced high blood pressure while she was at work, a NAL employee took her blood pressure, and another NAL employee sent her home.  (Doc. 31-1, pp. 151–54).  On September 11, 2015, Ms. Pride-Fort left work to go to her

doctor because she was feeling dizzy.  (Doc. 31-2, p. 62).[3]  Ms. Pride-Fort infers that NAL must have thought that she was experiencing a relapse of shingles on September 10th and 11th because her illness in September 2015 arose "within sixty days of her being off for 12 weeks with the shingles," and she was concerned, "based on what her physician stated, that the shingles were returning."  (Doc. 39, p. 9) (citing Doc. 31-1, p. 216).  Ms. Pride-Fort argues that shingles qualifies as a disability and that NAL had to believe that she had "a serious health condition beyond just becoming a little dizzy at work" if NAL sent her home.  (Doc. 39, pp. 11, 13).

There is no evidence to support Ms. Pride-Fort's contention that NAL must have regarded her as having had a shingles relapse on September 10, 2015 and September 11, 2015.  Ms. Pride-Fort cannot attribute to NAL her own concern that her shingles were coming back "because it was the same symptoms."  (Doc. 31-1, pp. 216-18).  There is no evidence that Ms. Pride-Fort told her supervisors or anyone at NAL that she believed she was having a recurrence of shingles.  And jurors could not reasonably infer that NAL regarded Ms. Pride-Fort as having shingles because her blood pressure was high or because she felt badly within 60 days of her release

---

[3] On September 15, 2015, Ms. Pride-Fort missed part of the workday to have an abdominal ultrasound.  (Doc. 31-1, p. 152; Doc. 31-3, p. 7).

to return to work from a bout of shingles that began in April 2015.[4]  Ms. Pride-Fort was not diagnosed with shingles, or any other ADA-qualifying disability in September 2015.  She was diagnosed with abdominal pain.  (Doc. 31-3, pp. 4-7).[5] On this record, a jury could not conclude either that Ms. Pride-Fort was actually disabled or that NAL regarded her as disabled when NAL terminated her.

Moreover, as a matter of law, under the "regarded as" standard, "a person is disabled if her employer perceives her as having an ADA-qualifying disability," but not if an employer believes her only temporarily ill.  *See Carruthers v. BSA Advert. Inc.*, 357 F.3d 1213, 1216 (11th Cir. 2004).  A "regarded as" claim "shall not apply to impairments that are transitory [i.e. less than six months' time] and minor."  42 U.S.C. § 12102(3); *see also* 29 C.F.R. § 1630.15 (f) (providing that whether an impairment is transitory and minor "is to be determined objectively").  Ms. Pride-Fort's medical conditions—high blood pressure and abdominal pain—were objectively transitory.  By her own account, Ms. Pride-Fort, after being instructed to go home Thursday and Friday, returned to work full days Saturday, Monday, and Wednesday and most of Tuesday (except for a doctor's appointment).  (Doc. 31-2,

---

[4] Symptoms of shingles include rash, fever, headache, chills, and upset stomach. https://www.cdc.gov/shingles/about/symptoms.html (last visited April 9, 2020).  When she returned to work July 13, 2015, Ms. Pride-Fort had recovered from shingles and been cleared by her doctor without restrictions.  (Doc. 31-1, p. 165; Doc. 31-2, p. 54).

[5] When Ms. Pride-Fort visited her doctor on September 11, 2015, she complained of stomach pain, dizziness, lightheadedness, and high blood pressure.  She was diagnosed with abdominal pain. (Doc. 31-3, pp. 4-6).

p. 62).  For this additional reason, Ms. Pride-Fort cannot establish that she was disabled or that NAL regarded her as having a disabling condition.[6]

Because Ms. Pride-Fort has not established a *prima facie* case of disability discrimination, the Court will not address her contention that NAL denied her a reasonable accommodation.  Accordingly, the Court will enter judgment in favor of NAL on Ms. Pride-Fort's ADA discrimination claim.

**FMLA**

Ms. Pride-Fort asserts claims for FMLA interference and retaliation.  The FMLA permits qualifying employees to take up to 12 weeks of unpaid leave during a 12-month period to address a "serious health condition."   29 U.S.C. § 2612(a)(1)(D).  A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  It is unlawful for an employer either to interfere with an employee's right to take leave for a protected reason or to discriminate

---

[6] The evidence in the record potentially could support a disability discrimination claim based on a record of impairment theory.  In her amended complaint, Ms. Pride-Fort asserts that she "has a history of having an impairment, which substantially limits one or more of her major life activities." (Doc. 22, ¶ 39).  But Ms. Pride-Fort did not address this variety of ADA discrimination in her opposition to NAL's motion for summary judgment.  Therefore, the Court deems Ms. Pride-Fort's "of record" ADA discrimination claim abandoned.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.  There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

against an employee for doing so.  29 U.S.C. § 2615(a)(1)–(2).  "To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims:  interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the [FMLA] ... and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the [FMLA]."  *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (internal citations omitted).

### FMLA Interference

As a threshold matter, "both [retaliation and interference] causes of action require the employee to establish that he qualified for FMLA leave" because he had a serious health condition.  *Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1166–67 (11th Cir. 2014); *see Russell v. North Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003) (holding that "[i]nterference and retaliation claims both require the employee to establish a 'serious health condition'").  For FMLA purposes, a "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care ... or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  A serious health condition involving continuing treatment by a health care provider includes:

> (a) Incapacity and treatment.  A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or

period of incapacity relating to the same condition, that also involves:

    (1) Treatment two or more times, within 30 days of the first day of incapacity ... by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

    (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

... [or]

(b) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

    (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;

    (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

    (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115.  Incapacity means the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

    With respect to her FMLA interference claim, Ms. Pride-Fort has not identified evidence that indicates that she had a serious health condition in September 2015 that made her eligible for FMLA leave.  As discussed, Ms.

Pride-Fort missed work for illness only two days in September 2015, and Ms. Pride-Fort has not presented evidence that suggests that her high blood pressure and dizziness were chronic conditions. Because she was not eligible for FMLA leave in September 2015, her interference claim fails as a matter of law.[7] *See Hurley*, 746 F.3d at 1166–67; *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1272 (11th Cir. 2012); *Walker v. Elmore Cty Bd. of Educ.*, 379 F.3d 1249, 1253 (11th Cir. 2004). And even if she had been eligible, by September, Ms. Pride-Fort already had used her 12 weeks of FMLA leave for 2015, so FMLA leave was not available to her.[8]

Ms. Pride-Fort argues that NAL should be estopped from asserting that she was ineligible for FMLA leave because Mr. Bush told her to complete an FMLA form, and her supervisor characterized the time she missed from work on September 10, 2015 as FMLA leave. (Doc. 39, p. 17).[9] To establish equitable estoppel, a plaintiff must show:

---

[7] As with her ADA claim, Ms. Pride-Fort's unsubstantiated suspicion that she might have been experiencing a relapse of the shingles in September 2015 is insufficient to establish a serious health condition for purposes of the FMLA.

[8] Ms. Pride-Fort initially took the position that NAL miscalculated her FMLA leave, and she had some leave remaining in September 2015. Ms. Pride-Fort retreated from that position in her deposition and conceded that NAL calculated her FMLA leave properly. (Doc. 31-1, pp. 174-75, 182).

[9] Mr. Bush denies that he had a conversation with Ms. Pride-Fort concerning FMLA leave in September 2015. (Doc. 31-4, p. 3). NAL initially coded Ms. Pride-Fort's leave on September 10,

(1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe that the party asserting the estoppel would rely on it; (4) the party asserting the doctrine did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*Dawkins v. Fulton Cty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013). Ms. Pride-Fort has not identified evidence that would enable her to establish the elements of equitable estoppel because she cannot demonstrate that Mr. Bush was aware in September 2015 that she had exhausted her FMLA leave or that she reasonably relied on anyone's suggestion that FMLA leave remained available to her in September 2015.

As for Mr. Bush, even if he did tell her to apply for FMLA leave, there is no evidence that he knew or should have known that Ms. Pride-Fort had exhausted her FMLA leave for 2015. Mr. Bush was not Ms. Pride-Fort's supervisor when she took FMLA leave in April 2015, and he was not her supervisor when she returned from FMLA leave in July 2015. (Doc. 31-1, pp. 91–92, 94–95, 115, 141). Unlike Mr. Bush, Ms. Pride-Fort either knew or should have known that she already had exhausted her 12 weeks of FMLA leave for 2015 when she left work on September 10, 11, and 15. Before taking FMLA leave in April 2015, Ms. Pride-Fort filed

---

September 11, and September 15 as FMLA leave. NAL later designated the missed time as unexcused. (Doc. 40-1, pp. 3-4).

FMLA paperwork with HR.  She testified that she was aware that she had twelve weeks of FMLA leave.  (Doc. 31-1, p. 158).  Ms. Pride-Fort was aware that her FMLA leave began April 20, 2015 and ended July 13, 2015.  When she returned from her FMLA leave, Ms. Pride-Fort did not ask whether she had FMLA time remaining.  (Doc. 31-1, p. 162).  If Mr. Bush instructed Ms. Pride-Fort to complete FMLA leave paperwork for September 10 and 11, then Ms. Pride-Fort should have questioned the availability of FMLA leave because she already had used so much leave in 2015.  On the record in this case, it was not reasonable for Ms. Pride-Fort to rely on an alleged statement from Mr. Bush concerning FMLA leave.  Besides, there is no evidence that Ms. Pride-Fort learned how NAL coded her missed hours on September 10, 11, and 15 until after she lost her job, so she could not have relied on that information before she was terminated.

Therefore, NAL is not estopped from arguing that Ms. Pride-Fort was not eligible for FMLA leave in September 2015.  Ms. Pride-Fort's FMLA interference claim fails as a matter of law.

### FMLA Retaliation

For purposes of her FMLA retaliation claim, Ms. Pride-Fort's shingles qualify as a serious medical condition under the FMLA.  To proceed with her FMLA retaliation claim, Ms. Pride-Fort must establish that NAL fired her in September 2015 because she used FMLA leave earlier that year.  *Strickland*, 239 F.3d at 1207.

To prove that NAL's stated reason for her termination was false, Ms. Pride-Fort relies on circumstantial evidence of discriminatory intent.[10]

In an employment action, a plaintiff who relies on circumstantial evidence to avoid summary judgment may satisfy either the burden-shifting framework that the United States Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248 (1981), or the convincing mosaic standard of *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011).   *See Smith*, 644 F.3d at 1328 (explaining that "establishing the elements of the *McDonnell Douglas* framework is not . . . the *sine qua non* for a plaintiff to survive summary judgment in an employment discrimination case") (internal quotation omitted).   A plaintiff "will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory [or retaliatory] intent."   *Smith*, 644 F.3d at 1328.

To establish a *prima facie* case of FMLA retaliation based on circumstantial evidence using the *McDonnell Douglas* framework, a plaintiff must demonstrate that: "(1) he engaged in statutorily protected activity; (2) he experienced an adverse

---

[10] Ms. Pride-Fort suggests that the record contains direct evidence of FMLA retaliation.  She cites her termination report which states:  "Portia pointed out at 7.5 points due to thinking it would be covered under FMLA."  (Doc. 40-1, p. 2).  This is not direct evidence of NAL's state of mind. Instead, it is evidence of Ms. Pride-Fort's state of mind.

employment action; and (3) there is a causal connection between the protected activity and the adverse action." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006); *see Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000) (applying *McDonnell Douglas* to FMLA retaliation claims).

Mr. Pride-Fort engaged in protected activity by taking 12 weeks of FMLA leave between April 2015 and July 2015. Ms. Pride-Fort's termination in September 2015 is an adverse employment action. For purposes of her *prima facie* case, evidence of the brief time between Ms. Pride-Fort's return from FMLA leave and her termination and of her supervisor's familiarity with her FMLA status when he fired her creates a presumption that her use of FMLA leave caused her termination. *See Jones v. Gulf Coast Health Care of Del.*, 854 F.3d 1261, 1271 (11th Cir. 2017) (temporal proximity measured from the last day of FMLA leave to the adverse employment action); *Strickland*, 239 F.3d at 1207 n.10; *Jones*, 854 F.3d at 1271 ("'Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action.'") (quoting *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010)); (Doc. 40-1, p. 4) (evidence that Mr. Speake, Ms. Pride-Fort's supervisor, was aware of her FMLA status when he fired her).

NAL states that it terminated Ms. Pride-Fort because she exceeded her allotted unexcused absences for 2015.   On her termination notice, Mr. Speake wrote: "Porsha pointed out at 7.5 points due to thinking it would be covered under FMLA." (Doc. 40-1, p. 2).[11]   Under the *McDonnell Douglas* burden-shifting framework, this evidence provides a legitimate, non-discriminatory basis for the employment action and rebuts the presumption that NAL terminated Ms. Pride-Fort to retaliate against her for her use of FMLA leave.  *Burdine*, 450 U.S. at 253.

To demonstrate that NAL's stated reason for her termination—accumulating more than 7.0 points under NAL's absentee policy— is pretext for retaliation for her use of FMLA leave, Ms. Pride-Fort must show "that the reason was false, and that [retaliation] was the real reason."  *Springer v. Convergys Customer Mgmt Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007).   The Court's inquiry is not whether the decision was prudent or fair, but whether the decision was retaliatory.  *See Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1361 (11th Cir. 1999).

There is sufficient evidence of pretext in the summary judgment record.  For starters, Ms. Pride-Fort's testimony contradicts NAL's assertion that she had 7.5 days of unexcused absences when NAL terminated her.   Ms. Pride-Fort has

---

[11] If NAL has a written attendance policy, the policy does not appear in the record.  NAL has submitted an affidavit from human resources manager Troy Van Fleet in which Mr. Van Fleet states that NAL's attendance policy permitted an employee to be terminated "when she accumulated over 7 points on her attendance record."  (Doc. 31-5, p. 3, ¶¶ 5–6).  Ms. Pride-Fort does not challenge that description of NAL's attendance policy.

explained that she did not ask to leave work on September 10; her supervisor instructed her to go home because she was dizzy, and she had high blood pressure. (Doc. 31-2, p. 62; *see also* (Doc. 31-1, pp. 152–54).[12]  Ms. Pride-Fort testified that she worked part of the following day before leaving to go to her doctor because she was still feeling dizzy.  (Doc. 31-2, p. 62).[13]  Ms. Pride-Fort indicated that she missed only 2.5 hours on September 15, 2015 when she visited her doctor again.  (Doc. 31-2, p. 62).  NAL recorded her unexcused hours on September 10, 11, and 15 respectively as 6.7, 7.0, and 4.0 hours.  (Doc. 40-1, p. 3).  If jurors accept Ms. Pride-Fort's testimony about the number of hours she missed between September 10 and September 15, then she may not have needed vacation time to remain under the 7-day unexcused leave threshold.

In addition, Ms. Pride-Fort testified that NAL did not notify her that she was nearing seven unexcused absences.  (Doc. 31-1, pp. 186–87).  Ms. Pride-Fort contends that if NAL had provided notice, then she would not have gone to the

---

[12] As with NAL's termination policy, the record does not contain a written policy that describes the situations in which a compelled absence may be excused, but there is testimony in the record that suggests that a compelled absence for illness may be excused only if an employee leaves NAL's premises in an ambulance.  (Doc. 31-1, pp. 153, 184).

[13] In the summary judgment record, Ms. Pride-Fort indicates alternatively that her supervisor told her to leave work September 11, 2015 and that she decided to leave on September 11, 2015 to see her doctor.  (*Compare* Doc. 31-1, pp. 152, 154 and Doc. 31-2, p. 62).  The reason that Ms. Pride-Fort left work on September 11, 2015 is not significant to the Court's analysis.  It is enough, viewing the evidence in the light most favorable to Ms. Pride-Fort, that she was instructed to leave work on September 10, 2015 and then not allowed to use leave or earned vacation time to avoid an unexcused absence for that day.

doctor; she "would have worked through it."  (Doc. 31-1, p. 153).  She would not have exceeded seven unexcused absences if she had not missed work to go to the doctor on September 11 and September 15.

Ms. Pride-Fort has testified that even if she did have more than seven days of excused absences, NAL should have allowed her to use her vacation time to cover her September 2015 absences because NAL's holiday shutdown leave policy did not apply to team leaders.  (Doc. 31-1, pp. 173, 175–79).  Ms. Pride-Fort stated: "[T]eam leaders in general wasn't [sic] required to save their vacation after September because we were required to be there at the end of the year at shutdown . . . . So that rule never applied to us."  (Doc. 31-1, pp. 175–76).  She also testified that in 2014, she had used vacation time three or four times after September and that just before NAL terminated her, Mr. Bush confirmed to HR that team leaders were not subject to NAL's holiday shutdown policy, but NAL fired her anyway.  (Doc. 31-1, pp. 176-77, 184-85).[14]

In the absence of vacation time, it appears that Ms. Pride-Fort may have been eligible for a Personal Leave of Absence under NAL's Leave of Absence policy. That policy provides:  "An employee may be eligible for a Personal Leave of

---

[14] In an affidavit, Mr. Bush states that NAL's holiday shutdown policy "applied to all employees, including Team Leaders."  (Doc. 31-4, p. 4).  For purposes of summary judgment, the Court accepts Ms. Pride-Fort's assertion that, at the time of her termination, Mr. Bush confirmed to HR that the shutdown policy did not apply to team leaders.

Absence due to his/her: (a) Personal and/or emergency needs, which do not qualify for FMLA leave." (Doc. 31-2, p. 66). There is no evidence that NAL offered Ms. Pride-Fort the option of designating part or all of her absences on September 10, 11, and 15 as a Personal Leave of Absence. The designation would have prevented Ms. Pride-Fort from exceeding seven days of unexcused absences.[15]

A plaintiff may establish pretext by showing that a "deviation from policy occurred in a discriminatory manner." *Rojas v. Florida*, 285 F.3d 1339, 1334 n.4 (11th Cir. 2002).

Finally, in Ms. Pride-Fort's termination report, Mr. Speake indicated that she was eligible for rehire but that he would recommend rehire with some reservation. The only criticism that he offered of her work, though, was her attendance which he rated "Unsatisfactory." He rated her cooperation, initiative, and quality of work "Good," and her job knowledge "Excellent." (Doc. 40-1, p. 2). Most of Ms. Pride-Fort's absenteeism in 2015 was for approved FMLA leave.

---

[15] NAL argues that under its leave policy, Ms. Pride-Fort had to request personal leave in writing, and she did not submit a written request for leave for the September 2015 absences. (Doc. 43, p. 11). That is true, but NAL overlooks the fact that Ms. Pride-Fort did not know that she was approaching her limit of unexcused absences or the fact that Mr. Bush instructed Ms. Pride-Fort to record the absences as FMLA leave. There is no evidence that Ms. Pride-Fort had reason to believe that she needed to request personal leave. To the contrary, Ms. Pride-Fort testified that when HR told her that she "went over [her] points," she asked to use her earned vacation time, Mr. Bush verified that she could use vacation time, HR instructed her to return to her line because Mr. Bush "would handle it," and the next thing she knew, "two supervisors [were] standing at the end of the line waiting to escort [her] out" of NAL. (Doc. 31-1, pp. 184–85).

That just two months after she used her 12 weeks of FMLA leave NAL required Ms. Pride-Fort to leave work and enforced its policies so that Ms. Pride-Fort would accumulate just enough points to be terminated suggests that Ms. Pride-Fort's unexcused absences were not the true reason for her termination. A jury must examine the circumstantial evidence that Ms. Pride-Fort has presented and determine whether retaliation for her absence on FMLA leave was the real reason for her termination.

Accordingly, the Court denies summary judgment with respect to Ms. Pride-Fort's FMLA retaliation claim based on her use of FMLA leave from April to July 2015.

### Race Discrimination under Title VII and § 1981

Ms. Pride-Fort asserts that NAL discriminated against her in violation of Title VII and § 1981 because she is black. Title VII makes it unlawful for an employer to refuse to hire, discharge, or "otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment" based on race. 42 U.S.C. § 2000e-2(a)(1). Section 1981 prohibits racial discrimination in making and enforcing private contracts, including employment contracts. 42 U.S.C. § 1981. Typically, courts address race discrimination claims under these statutes together because the statutes "have the same requirements of

proof and use the same analytical framework." *Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

To establish a *prima facie* case of race discrimination based on circumstantial evidence using the *McDonnell Douglas* burden-shifting framework, a plaintiff must show that she is a member of a protected class; was qualified for her position; suffered an adverse employment action; and was treated less favorably than employees outside of her protected class who were "similarly situated in all material respects." *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003); *Lewis v. Union City, Ga.*, 918 F.3d 1213, 1218, 1227–28 (11th Cir. 2019).[16]

It is undisputed that Ms. Pride-Fort is a member of a protected class, was qualified for her position, and was terminated.[17]  NAL stated that it terminated Ms. Pride-Fort, a team leader, because she exceeded by .5 days the number of allotted unexcused absences in a 12-month period when she became sick and missed part of

---

[16] Ms. Pride-Fort has not provided direct evidence of discrimination.  She contends that Mr. Bush's comment that she and a group of mostly black women were "bitchy" constitutes direct evidence of racial discrimination.  Statements that neither mention race nor are directed at a single racial group do not constitute direct evidence of racial discrimination.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) ("[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination.").

[17] Again, on Ms. Pride-Fort's "Termination Report," Mr. Speake rated her as good or excellent in every job category but attendance and indicated that Ms. Pride-Fort was eligible for rehire.  (Doc. 40-1, p. 2).

the workdays on September 10, 11, and 15, and NAL did not allow Ms. Pride-Fort to use NAL's leave policy or her earned vacation time to cover the September absences.   Thus, to complete her *McDonnell Douglas prima facie* case, Ms. Pride-Fort must identify a NAL team leader who is not black and who NAL allowed to use earned vacation post-September 1 or NAL leave to avoid an unexcused absence or who was not terminated despite accruing seven or more unexcused absences. *Lewis*, 918 F.3d at 1218, 1227–28.

In her deposition, Ms. Pride-Fort testified that there were "plenty" of white team leaders who were allowed to use earned vacation days after September 1 to cover absences, but she could not name a white employee who had this opportunity, and she did not know whether the white team leaders who used vacation time after September 1 had amassed more than 32 hours of earned vacation time per NAL's holiday shutdown policy. (Doc. 31-1, pp. 145–46, 175–80). Ms. Pride-Fort suggests that NAL rehired Ryan Bullock, a white male, after he used FMLA leave, but she testified that she "do[es]n't know anything about [Mr. Bullock]." (Doc. 31-1, p. 146).[18]   Without more detail, the Court cannot assess whether Mr. Bullock was

―――――――――――――

[18] In her deposition, Ms. Pride-Fort testified that she believed Mr. Bullock was treated differently because "his case was similar.  I believe he had medical issues.  He had exceeded his points, but they put at the bottom of his termination paper to bring him back as some type of tech, some type of promotion." (Doc. 31-1, p. 146).  Ms. Pride-Fort did not indicate in her deposition whether Mr. Bullock was a team leader.  Mr. Bullock, like Ms. Pride-Fort, was terminated for exceeding his points, meaning he suffered the same adverse employment action as Ms. Pride-Fort when he exceeded his allotted unexcused absences.  The record does not indicate whether Ms. Pride-Fort applied for reinstatement after NAL terminated her employment.

similarly situated to Ms. Pride-Fort in all material respects or whether there was a distinguishing basis for differing treatment. *See Lewis generally*; *Smith v. Library Bd of Homewood*, 2:15-cv-02094-MHH, 2018 WL 2011026, at *7 (N.D. Ala. Apr. 30, 2018) (citing *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310 (11th Cir. 1998), *modified in part*, 151 F.3d 1321 (11th Cir. 1998)). As such, Mr. Bullock is not a valid comparator. Because Ms. Pride-Fort has not offered evidence of a similarly situated white employee who NAL allowed to use leave or earned vacation time to excuse absences and avoid termination, she cannot make out a *prima facie* case of race discrimination.

Therefore, to survive NAL's motion for summary judgment on her race discrimination claims, Ms. Pride-Fort must present "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *See Smith*, 644 F.3d at 1327–28. The circumstantial evidence of potential miscounting of unexcused absences, lack of notice of unexcused absences, and failure to allow Ms. Pride-Fort to use leave or earned vacation time to compensate for September absences that supports Ms. Pride-Fort's FMLA retaliation claim also factors into her mosaic of circumstantial evidence of race discrimination. But missing from the mosaic is evidence tying this circumstantial evidence to racial animus. The proximity of Ms. Pride-Fort's termination to her use of FMLA leave and the indication that NAL was reluctant to rehire Ms. Pride-Fort because of her absences

links the evidence of NAL's purported failure to follow company policy to Ms. Pride-Fort's exercise of her statutory rights under the FMLA for purposes of her FMLA retaliation claim.  There is no similar evidence connecting the circumstantial evidence regarding Ms. Pride-Fort's termination to racial animus.

For her race discrimination claim, Ms. Pride-Fort argues that she was "given increased work assignments as compared to white Team Leaders.  At one point she was given 13 production lines to manage as opposed to other Team Leaders with two production lines."  (Doc. 39, p. 25) (citing Doc. 31-1, p. 206).  This evidence might serve as circumstantial evidence of racial animus, but this disparate treatment occurred two years before her termination and involved none of the decisionmakers who participated in her termination.  (Doc. 31-1, pp. 206–209).  And Ms. Pride-Fort acknowledges that the inequity was resolved before she asked to transfer to another department.  (Doc. 31-1, pp. 206–07).

Ms. Pride-Fort also argues that Eric Bush made racially discriminatory remarks about black women, referring to them as "bitchy" and "y'all people" and stating "y'all need to go to church."  (Doc. 31-1, p. 101).  According to Ms. Pride-Fort, Mr. Bush told her and a group of "mostly black women" that they would get along well with Jennifer Howell, the white supervisor, because "[a]ll of y'all are . . . bitchy."  (Doc. 31-1, p. 101).  Mr. Bush allegedly made these remarks in 2014 or early 2015, months before Ms. Pride-Fort's termination.  (Doc. 31-1, pp. 102–

03).  "[S]tray remarks that are isolated and unrelated to the challenged employment action" are insufficient to prove discriminatory intent.  *See Ritchie v. Industrial Steel, Inc.*, 426 Fed. Appx. 867, 873 (11th Cir. 2011).[19]

Because Ms. Pride-Fort has not presented a *prima facie* case of race discrimination or a convincing mosaic of circumstantial evidence of race discrimination, the Court will enter judgment for NAL on Ms. Pride-Fort's Title VII and § 1981 race discrimination claims.

---

[19] Ms. Pride-Fort devotes fewer than two full pages of her summary judgment brief to her race discrimination claim.  (Doc. 39, bottom of p. 23, p. 24, and top of p. 25).  Beyond the arguments that she made in her brief, Ms. Pride-Fort mentioned in her deposition testimony instances of disparate treatment that she attributes to racial animus.  For example, she testified that Hans Pell, her supervisor in April 2015, did not invite her to meetings to which he invited white team leaders, he clapped or whistled to get her attention, and he did not respond when subordinate employees, like Erica Lynch, harassed her.  (Doc. 31-1, pp. 99, 111–12).  But there is no evidence that Mr. Pell had anything to do with Ms. Pride-Fort's termination.  Absent a cat's paw theory of liability, the conduct of a non-decisionmaker generally will not be imputed to a decisionmaker.  *See Brinkley v. Dialysis Clinic, Inc.*, 403 F. Supp. 2d 1090, 1096–97 (M.D. Ala. 2005) (citing *Jones*, 151 F.3d at 1323).  Ms. Pride-Fort does not rest her racial discrimination claim on a cat's paw theory concerning Mr. Pell.

Ms. Pride-Fort also pointed out that that human resources did not terminate Brenda Hamilton when Ms. Hamilton attacked her but later terminated Ms. Hamilton when she attacked a white employee. (Doc. 31-1, p. 110).  Ms. Pride-Fort overlooks the fact that HR sent Ms. Hamilton home after she attacked Ms. Pride-Fort and then terminated Ms. Hamilton after she committed a second infraction. This evidence does not create an issue from which a jury could infer discriminatory animus on the part of NAL's upper management and human resources department.

Ms. Pride-Fort devotes only one-half page of her brief to a final "retaliation argument" that concerns Title VII retaliation, and she offers no argument concerning her ADA retaliation claim. The Court deems these claims abandoned.  *See Jones v. Bank of Am., N.A.*, 564 Fed Appx. 432, 434 (11th Cir. 2014); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

## CONCLUSION

For the reasons discussed above, the Court enters judgment in favor of North American Lighting with respect to Ms. Pride-Fort's Title VII, § 1981, and ADA claims.  With respect to Ms. Pride-Fort's FMLA claims, the Court grants judgment in favor of NAL on all interference claims and any claims based on Ms. Pride-Fort's eligibility for FMLA leave in September.  The Court denies summary judgment on Ms. Pride-Fort's claim that NAL retaliated against her for using FMLA leave from April 2015 through July 2015.  By separate order, the Court will set Ms. Pride-Fort's FMLA retaliation claim for trial.

**DONE** and **ORDERED** this April 23, 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE