# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| Porsha Linnea Pride-Fort, | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| | } | |
| **v.** | } | Case No.:  3:17-cv-01203-MHH |
| | } | |
| | } | |
| North American Lighting, Inc., | | |
| | | |
| **Defendant.** | | |

## FINDINGS OF FACT AND LAW

To resolve Ms. Pride-Fort's FMLA retaliation claim against North American Lighting, Inc., the Court held a bench trial.  NAL fired Ms. Pride-Fort for "absenteeism" shortly after she returned from FMLA leave.  Ms. Pride-Fort contends that NAL fired her in retaliation for her use of FMLA leave.  At trial, the Court made several findings of fact.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court repeats those findings below, adds supplemental findings of

fact, and makes findings of law to resolve Ms. Pride-Fort's FMLA retaliation claim.[1]

Because the Court previously resolved the balance of Ms. Pride-Fort's claims against

NAL, this opinion will conclude this lawsuit.[2]

## *Findings of Fact*

1.      After working for several months as a temporary employee, Ms. Pride-Fort became a permanent employee of North American Lighting on January 24, 2011. (Doc. 71-9; Doc. 80, p. 192). She worked at NAL's Muscle Shoals plant where NAL makes vehicle headlights and taillights. (Doc. 79, p. 4).

2.      Ms. Pride-Fort quickly became a team leader. She flourished in that role, supervising anywhere from six to 50 operators at a time. (Doc. 79, p. 6). There is no indication in the record that Ms. Pride-Fort's work as a team leader suffered between 2011 and 2015 when NAL fired Ms. Pride-Fort. (Doc. 80, pp. 192–93).

---

[1] Rule 52(a)(1) provides:

> (1) *In General.* In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

[2] Initially, Ms. Pride-Fort asserted claims against NAL for race discrimination under Title VII and 42 U.S.C. § 1981, disability discrimination under the Americans with Disabilities Act, retaliation under Title VII and the ADA, and interference with and retaliation for exercise of her rights under the Family Medical Leave Act. (Doc. 22, p. 1). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court entered judgment in favor of NAL on all of Ms. Pride-Fort's claims other than her FMLA retaliation claim. (Doc. 45, p. 31).

3.     During her years of employment with NAL, Ms. Pride-Fort received little training from NAL regarding FMLA leave or the other types of leave that were available to hourly employees like Ms. Pride-Fort.  (Doc. 80, p. 193).

4.     NAL's December 16, 2013 Hourly Team Member Guidebook for the Muscle Shoals plant was in effect during the 12 months preceding Ms. Pride-Fort's termination.  (Doc. 71-2; Doc. 78, p. 11, tpp. 34–35).  The Guidebook contains leave and vacation provisions.   The provisions relevant to Ms. Pride-Fort's retaliation claim address NAL's FMLA policy (Doc. 71-2, p. 18), attendance policy (Doc. 71-2, pp. 9–10), vacation policy, (Doc. 71-2, pp. 11–12), Earned Time Off or ETO policy (Doc. 71-2, p. 14), leaves of absence policy (Doc. 71-2, p. 19), and Christmas shutdown policy (Doc. 71-2, p. 22).[3]

5.     Under NAL's FMLA policy, "[t]o be eligible for an FMLA leave, a team member must have worked for NAL for a total of 12 months and have worked at least 1,250 hours during the 12-month period immediately preceding the commencement of the leave."  (Doc. 71-2, p. 18).  Eligible NAL employees were "entitled to leave for up to a total of 12 workweeks during any 12-month period." (Doc. 71-2, p. 18).  NAL directed employees who wished to request FMLA leave or

---

[3] Ms. Pride-Fort testified that she received an NAL handbook when she began working there in 2010.  (Doc. 79, p. 9).  The Court has found no evidence that indicates whether Ms. Pride-Fort received a copy of NAL's December 16, 2013 Hourly Team Member Guidebook for the Muscle Shoals plant.  Ms. Pride-Fort testified that she does not know if the December 16, 2013 Hourly Team Member Guidebook was in effect in 2015.  (Doc. 79, p. 62).

learn more about FMLA leave to "contact their local Human Resources Department." (Doc. 71-2, p. 18).[4] After returning from FMLA leave, "a team member will be restored to his/her original job or to an equivalent job with equivalent pay, benefits, and other terms and conditions of employment (except as permitted under the law)." (Doc. 71-2, p. 18).

6.     Because NAL needs reliable employee attendance to meet customers' production requirements, while Ms. Pride-Fort worked there, NAL used a "no-fault" point system to track the attendance of more than 1,000 employees. (Doc. 71-2, p. 9; Doc. 79, pp. 23, 55; Doc. 80, pp. 11, 29–30). NAL's written description of its attendance point system is internally inconsistent. Initially, it states: "Any absence greater than four hours will be assessed one full point. Any absence not exceeding four hours will be assessed one-half point." (Doc. 71-2, p. 9). A bit later, the policy provides that for an absence not exceeding 50% of an employee's regularly scheduled work shift, NAL would assess 0.5 points; for an absence that exceeded 50% of a shift, NAL would assess 1.0 point. (Doc. 71-2, p. 10). NAL hourly employees worked 8-hour, 10-hour, or 12-hour shifts. (Doc. 79, p. 68; Doc. 80, p. 17). For a 12-hour shift, under the first provision, an employee would be assessed a full point when an absence exceeded four hours; under the second, an employee

_____

[4] NAL's corporate headquarters is in Paris, Illinois, and it operates plants in Flora, Illinois; Salem, Illinois; Paris, Illinois; Farmington Hills, Michigan; and Muscle Shoals, Alabama; and a tool shop in Elberfeld, Indiana. (*See* Doc. 71-5).

would be assessed a full point when an absence exceeded six hours.  NAL required employees "to track [their] attendance points."  (Doc. 71-2, p. 10).

7.      NAL's written attendance policy provides that employees were subject to progressive discipline based on point levels.  (Doc. 71-2, p. 9).  When an employee received four points and five points, NAL's absence policy required NAL to give the employee a "verbal warning."  (Doc 71-2, p. 9).  NAL provided "verbal warnings" to employees in writing.  (Doc. 80, pp. 11–12, 63).  When an employee reached six points, NAL's policy required NAL to give the employee a written warning.  (Doc. 71-2, p. 9).  When an employee reached seven points, NAL could fire the employee.  (Doc. 71-2, p. 9).

8.      Under the attendance policy, accrued attendance points dropped from an employee's record "one year from the date on which the absence occurred." (Doc. 71-2, p. 9; *see also* Doc. 79, p. 28).

9.      On a September 17, 2015 termination report, Ms. Pride-Fort's immediate supervisor, Stephen Speake, wrote that Ms. Pride-Fort "pointed out at 7.5 points due to thinking it would be covered by FMLA."  (Doc. 79-10).  The "it" to which Mr. Speake referred were Ms. Pride-Fort's absences on September 10, 11, and 15, 2015 for which she accrued attendance points.  NAL officially fired Ms. Pride-Fort on September 18, 2015 for "absenteeism."  (Docs. 71-9).

10. On September 10, 2015, Ms. Pride-Fort arrived at work at 4:56 a.m. (Doc. 71-12, p. 18). While working, Ms. Pride-Fort began feeling light-headed and dizzy. (Doc. 79, pp. 9–10). Andrew Watkins, a NAL supervisor, directed Ms. Pride-Fort to have her blood pressure taken. Because Ms. Pride-Fort's blood pressure was high, Mr. Watkins sent her home. (Doc. 79, pp. 10, 12, 51–53). Ms. Pride-Fort left NAL at 8:19 a.m. on September 10, 2015. (Doc. 71-12, p. 18; Doc. 80, p. 118). Ms. Pride-Fort reported to work on September 11, 2015 at 4:57 a.m., but she still felt badly, so she left work at 9:01 a.m. to see her doctor. (Doc. 79, p. 11; Doc. 71-12, p. 18; Doc. 80, p. 119; *see* Doc. 73-4, p, 3). Ms. Pride-Fort's doctor scheduled a test for September 15, 2015, and Ms. Pride-Fort missed several hours of work to attend the test. (Doc. 79, pp. 13–14; Doc. 71-12, p. 18; *see* Doc. 73-4, p. 6).

11. NAL initially coded Ms. Pride-Fort's September 10 and 11 absences as FMLA leave in Kronos, NAL's time-keeping program. (Doc. 79, p. 18; Doc. 80, pp. 110, 122, 139–41; Doc. 71-12, p. 18). Because the absences were coded as FMLA leave, NAL did not immediately assess points for the absences. NAL coded the September 15, 2015 absence as a half-point unexcused absence. (Doc. 71-12, p. 18).[5]

---

[5] It is not clear from the record who entered the initial codes for Ms. Pride-Fort's absences in September 2015, but Mr. Bush testified that Ms. Pride-Fort's supervisor coded the absences. (Doc. 80, p. 19). Therefore, the Court infers that Mr. Speake coded the September 10 and 11 absences as FMLA leave. Mr. Speake did not testify at trial. (*See generally* Doc. 80, pp. 13–14).

12.     By September 10, 2015, Ms. Pride-Fort already had exhausted her 480 hours of FMLA leave for the 12-month period preceding September 10.  In the spring of 2015, Ms. Pride-Fort developed shingles.  (Doc. 79, pp. 6–7).  On April 20, 2015, Ms. Pride-Fort began a period of FMLA leave.  She used 12 continuous weeks of FMLA leave (Doc. 71-3), and returned to NAL on July 13, 2015, (Doc. 71-12, p. 16).[6]  As a result, Ms. Pride-Fort could not use FMLA leave to excuse her September 2015 absences.

13.     On September 17, 2015, NAL's HR team reviewed Ms. Pride-Fort's absences on September 10, 11, and 15 and determined that the absences were "coded wrong" because Ms. Pride-Fort already had exhausted her FMLA for the relevant 12-month period.  (Doc. 73-1, pp. 2–3).  HR employee Kathleen Heneghan revised Ms. Pride-Fort's attendance record and recoded her leave on September 10 and 11 as unexcused absences.  (Doc. 71-11, p. 1; Doc. 73-1, p. 2; Doc. 80, p. 83).[7]  The

---

[6] On June 18, 2015, NAL prepared a letter to Ms. Pride-Fort advising her that as of July 9, 2015, she would exhaust her 12 weeks of FMLA leave.  (Doc. 71-5).  On NAL's FMLA calendar for Ms. Pride-Fort, someone wrote that Ms. Pride-Fort exhausted her FMLA leave on July 10, 2015 and returned to work on July 13, 2015.  (Doc. 71-3).  NAL coded Ms. Pride-Fort's time on July 10, 2015 as FMLA leave.  (Doc. 71-3; Doc. 71-12, p. 16).

Initially, NAL coded Ms. Pride-Fort's FMLA absences on April 20–24 as unexcused absences.  (Doc. 71-12, p. 15; Doc. 79, p. 27).  At the time, Ms. Pride-Fort's supervisor was not aware that she was on FMLA leave.  Troy Van Fleet, NAL's current HR manager for the Muscle Shoals plant, explained that "something has to be entered into the employee's pay record.  So if there's no information for the supervisor, they would point them or HR might point them, if we have no clock-in or out times or any information to the contrary."  (Doc. 80, p. 65).

[7] Though Ms. Heneghan wrote that Ms. Pride-Fort's time on September 15, 2015 was miscoded as FMLA leave, (Doc. 73-1, p. 2), the time is coded on NAL's Kronos report as a half-point of

unexcused absences on September 10 and 11, 2015 yielded two points that placed Ms. Pride-Fort at the seven-point threshold at which NAL could fire her. (Doc. 71-11).

14. Ms. Pride-Fort did not realize that her absence on September 11 brought her to a total of seven attendance points. As noted, under company policy, when a NAL employee accumulates her fourth and fifth attendance points, NAL must give the employee a "verbal warning," (Doc 71-2, p. 9), and provide a record of the "verbal warnings" to employees in writing, (Doc. 80, pp. 11–12). NAL's HR Department issues written attendance point warnings the week following the point assessment. (Doc. 80, p. 12). HR provides the written warning to a team member's supervisor, so that the supervisor may review the warning with the employee and have the employee sign the warning. (Doc. 80, p. 38). After a team member signs an attendance warning, the supervisor must return the signed document to HR so that HR may place the signed document in the employee's file. (Doc. 80, p. 38, 65–67). Ms. Pride-Fort accumulated her fourth attendance point on February 11, 2015, (Doc. 80, pp. 33–34, 64; Doc. 71-12, p. 13), and her fifth point on February 26, 2015, (Doc. 80, p. 64; Doc. 71-12, p. 14). It is undisputed that Ms. Pride-Fort's personnel file contains no written warnings for attendance points she accumulated in 2015.

---

unexcused leave, (Doc. 71-12, p. 18). It is possible that HR changed the time for September 15, 2015 to 0.5 unexcused points in Kronos. (Doc. 80, pp. 84–85). The testimony concerning the entry is not clear.

(Doc. 80, p. 67). Either HR or Ms. Pride-Fort's supervisor in the spring of 2015 is responsible for the error. (Doc. 80, p. 34).[8]

15.     As noted, NAL required employees "to track [their] attendance points" independently. (Doc. 71-2, p. 10 ("It is the responsibility of the team member to track attendance points."); *see also* Doc. 80, p. 80). Ms. Pride-Fort understood that she was responsible for tracking her points. (Doc. 79, pp. 60–61).

16.     Had Ms. Pride-Fort asked her supervisor on September 10, 2015 how many points she had, her Kronos attendance record would have indicated to her supervisor that she had been assessed 10.5 points for the 12 preceding months (Doc. 71-12, pp. 9–18), because the report contains point errors on September 12, 2014 and April 20, April 21, April 22, April 23, and April 24, 2015 (Doc. 71-12, pp. 9,

---

[8] In the 12-month period preceding her termination, Ms. Pride-Fort accumulated the following attendance points: November 17, 2014 (0.5 points); November 25, 2014 (0.5 points); January 7, 2015 (1.0 points); January 13, 2015 (1.0 points); February 11, 2015 (1.0 points); February 26, 2015 (0.5 points); April 9, 2015 (0.5 points); September 10, 2015 (1 point); September 11, 2015 (1 point); September 15, 2015 (.5 points). (Doc. 71-12, pp. 9, 11–18; Doc. 79, pp. 47–49).

Under NAL's policy, Ms. Pride-Fort should have received written attendance point warnings for her fourth and fifth points before she began her FMLA leave in April 2015. When Ms. Pride-Fort returned to work from FMLA leave, NAL did not provide verbal or written warnings telling her that she had accumulated five attendance points. (Doc. 79, p. 9). NAL did not provide the progressive discipline called for in its attendance policy. (Doc. 71-2, p. 9).

Mr. Bush, Ms. Pride-Fort's second-tier supervisor, testified that NAL did not violate policy when it failed to give Ms. Pride-Fort written warnings for her fourth and fifth attendance points. (Doc. 80, p. 41). The Court does not find Mr. Bush's testimony credible.

15).[9] Using the 12-month lookback, Ms. Pride-Fort actually had 5.0 points as of September 10, 2015.

17.    Ms. Pride-Fort also did not realize that she would receive an attendance point for the hours she missed on September 10, 2015 when Mr. Watkins directed her to go home.  No one told Ms. Pride-Fort that she would receive one attendance point because she followed Mr. Watkins's instruction to leave work.  (Doc. 79, p. 11).  Under NAL policy, when a supervisor instructs an employee to leave work, HR must investigate and determine whether the employee should be assessed a whole or half point for the absence.  (Doc. 80, pp. 9–10).[10]  There is no evidence that indicates that Mr. Watkins reported to HR that he sent Ms. Pride-Fort home on September 10, 2015.  There is evidence that HR examined the September 10 absence after Ms. Pride-Fort asked HR to consider whether she could use vacation time to cover the absence but not before HR determined that Ms. Pride-Fort had "pointed out."  (Doc.

---

[9] Ms. Pride-Fort's Kronos report reflects 0.5 points on September 12, 2014, (Doc. 71-12, p. 9), but that time actually was vacation time, (Doc. 73-7, p. 1).  The five attendance points between April 20, 2015 and April 24, 2015 (Doc. 71-12, p. 15) should be coded "FMLA."  (Doc. 71-3; *see also* Doc. 80, p. 64).

[10]  Carli Sanders, NAL's former assistant general manager of manufacturing, stated in her deposition that an employee would be assessed a point when "her supervisor or manager directed her to leave" for the day.  (Doc. 78, p. 11, tp. 36).  Eric Bush, NAL's current assistant general manager of manufacturing and the general foreman for the plant in which Ms. Pride-Fort worked at the time of her termination, testified that HR would investigate to determine whether to assess a point when a supervisor sent an employee home.  The Court credits Mr. Bush's testimony for two reasons.  First, Mr. Bush is a current NAL employee, so he should be more familiar with NAL policy.  Second, as discussed below, the record demonstrates that NAL could and did excuse employee absences from time to time.

79, pp. 80–81).[11] Ms. Pride-Fort explained to Ms. Heneghan that she was sent home from work on September 10, but, according to Ms. Heneghan, because Ms. Pride-Fort did not leave work in an ambulance, she received an attendance point for that day. (Doc. 79, pp. 14–15).

18. When Mr. Speake completed Ms. Pride-Fort's termination report on September 17, 2015, he indicated that her work was "good" in cooperation, initiative, and quality of work, and "excellent" in job knowledge. (Doc. 78, p. 7, tp. 21; Doc. 79, p. 19; Doc. 71-10, p. 1). Mr. Speake was critical of Ms. Pride-Fort only with respect to attendance. (Doc. 71-10, p. 1). The reason Mr. Speake provided for Ms. Pride-Fort's termination was absenteeism. (Doc. 71-10, p. 1). Mr. Speake wrote that, with some reservation, he would rehire Ms. Pride-Fort. (Doc. 71-10, p. 1; Doc. 79, p. 28).

---

[11] There is a fair amount of trial testimony concerning vacation and leaves of absence that Ms. Pride-Fort argued that NAL should have allowed her to use to cover the September 10 absence. NAL's "Leaves of Absences" policy includes "emergency leave," "personal leave," and "supplemental medical leave." (Doc. 71-2, p. 19). The "emergency leave" is available only to employees who have worked for NAL for less than one year. (Doc. 71-2, p. 19). "Personal leave" is available to NAL employees with more than one year of service but taking personal leave results in an assessment of 2.0 absenteeism points. (Doc. 71-2, p. 19). "Supplemental medical leave" also is available to NAL employees with more than one year of service. (Doc. 71-2, p. 19). Employees may take supplemental medical leave when they exhaust FMLA or personal leave and when they cannot return to work due to a medical condition. (Doc. 71-2, p. 19). Supplemental medical leave also may be available if an employee returns from leave, is again placed on medical leave within 30 days, and has exhausted all other leaves. (Doc. 71-2, p. 19). Under these policies, Ms. Pride-Fort either was not eligible for leave or would have received attendance points even with leave.

19.     Mr. Bush, the general foreman supervising Ms. Pride-Fort's department when she was fired, testified that Ms. Pride-Fort did a good job as a team leader and that he was willing to rehire Ms. Pride-Fort.  (Doc. 80, p. 6).

20.     Mr. Van Fleet, NAL's current HR manager, testified that NAL does not simply fire employees when they point out:  "We wouldn't just fire them at seven and you're done.  We would look at the points, why they were out."  (Doc. 80, p. 79).

21.     When Ms. Heneghan completed Ms. Pride-Fort's "Termination Report Form" on September 18, 2015, Ms. Heneghan wrote that Ms. Pride-Fort was terminated for absenteeism and was not eligible for rehire.  (Doc. 71-9, p. 1).

22.     Between April 1, 2015 and December 18, 2015, NAL terminated 87 employees for absenteeism.  (Doc. 71-13, pp. 1–2).  The record does not indicate how many of the 87 terminated employees HR qualified as eligible for rehire.

23.     The NAL employee who replaced Ms. Pride-Fort as a team leader used FMLA leave before and after NAL promoted her to team leader.  She still is employed at NAL.  (Doc. 80, pp. 121–22).

*Conclusions of Law*

"To prove FMLA retaliation, an employee must show that [her] employer *intentionally* discriminated against [her] for exercising an FMLA right." *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1267 (11th Cir. 2008) (citing 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c)) (emphasis in *Martin*). "Unlike an interference claim, an employee 'bringing a retaliation claim faces the increased burden of showing that [her] employer's actions were motivated by an impermissible retaliatory or discriminatory animus.'" *Martin*, 543 F.3d at 1267–68 (quoting *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001)). Therefore, to succeed on her FMLA retaliation claim, Ms. Pride-Fort must establish by a preponderance of evidence that when NAL terminated her employment in September 2015, NAL intended to retaliate against her for her use of FMLA leave earlier that year. (*See* Doc. 45, p. 18) (citing *Strickland*, 239 F.3d at 1207).

"[A] plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Ms. Pride-Fort relies on circumstantial evidence to prove NAL's intent. She points to NAL's failure to follow its attendance policy, NAL's refusal to allow her to use accrued vacation time or some other form of leave to cover her September 10 absence when her supervisor

13

told her to leave work because she was ill, and HR's decision to code her as ineligible for rehire.

Ms. Pride-Fort has established convincingly that NAL violated its attendance policy. It is undisputed that NAL did not comply with its obligation to give her verbal and written warnings when her supervisor assessed her fourth and fifth attendance points. Ms. Pride-Fort also has established that without written warnings, it is extremely difficult for a NAL employee to keep track of her attendance points independently. An employee does not know with certainty when a supervisor assesses an attendance point, and NAL does not correct misapplied points in its Kronos time-keeping system, so an employee who requests a point total from her supervisor may be given an inaccurate, unreliable point total. A company's failure to comply with its operating procedures may evidence discriminatory intent. *See, e.g.*, *Hutchinson v. Sec'y, Dep't of Veterans Affairs*, 766 Fed. Appx. 883, 888 (11th Cir. 2019) ("Departures from normal procedures may be suggestive of discrimination.") (quoting *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985)); *Berg v. Fla. Dep't of Lab. and Emp. Sec., Div. of Vocational Rehab.*, 163 F.3d 1251, 1255 (11th Cir. 1998) ("[Appellee's] counsel argued, during a hearing on the [appellant's] motion for summary judgment, that inconsistent application of employment policies is circumstantial evidence of discrimination. This may be true.").

In this case, NAL's significant and undisputed policy lapses are not evidence of discriminatory animus related to Ms. Pride-Fort's use of FMLA leave. Ms. Pride-Fort accrued her fourth and fifth attendance points before she began her 12 weeks of FMLA leave on April 20, 2015. She accrued her fourth point on February 11, 2015, (Doc. 71-12, p. 13; Doc. 80, p. 34), and her fifth point on February 26, 2015, (Doc. 71-12, p. 14; Doc. 80, p. 64). Ms. Pride-Fort should have received written warnings for those points by the end of the first week of March 2015. Because this policy breach occurred before Ms. Pride-Fort began her FMLA leave, the breach cannot be evidence of bias tied to Ms. Pride-Fort's FMLA leave. *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him.").[12]

Ms. Pride-Fort's supervisor did not have an opportunity to provide written warnings for Ms. Pride-Fort's absences in September of 2015 because NAL terminated her within a day of recoding her absences on September 10, 11, and 15 as attendance points rather than FMLA points. Because Ms. Pride-Fort had exhausted her annual FMLA leave before September 2015, NAL's HR department properly determined that Ms. Pride-Fort could not use FMLA leave for her

---

[12] *See also Smith v. Fla. Parishes Juvenile Justice Comm'n*, No. 15-6972, 2017 WL 1177905, at *9 (E.D. La. Mar. 30, 2017) ("Obviously, defendants' actions that occurred <u>before</u> plaintiff exercised her FMLA rights cannot be retaliatory for that protected activity. Because the disciplinary conduct began <u>before</u> [Ms.] Smith requested FMLA leave and continued unchanged when she returned from leave . . . she cannot show any causal link between her taking leave and the disciplinary actions.") (emphasis in *Smith*).

September 10, 11, and 15 absences. And even if Ms. Pride-Fort's supervisor originally had coded the time Ms. Pride-Fort missed on September 10 and 11 as absences, NAL's timekeeping program would not have processed the absences and sent Ms. Pride-Fort's supervisor written warnings for those absences until after the pay period in which the absences occurred, and the warnings would have come too late to help Ms. Pride-Fort because NAL was authorized to terminate her when she accrued her seventh point on September 11.

NAL also seems to have violated company policy in its handling of Ms. Pride-Fort's September 10, 2015 absence. On that day, Mr. Watkins, a NAL supervisor, sent Ms. Pride-Fort home because she was ill, and it was unsafe for her to remain at work. According to Mr. Bush, when a supervisor instructs an employee to leave work, HR must investigate and determine whether the employee should be assessed an attendance point for the absence or whether the absence should be excused. (Doc. 80, pp. 9–10). There is no evidence that Mr. Watkins reported to HR or to Ms. Pride-Fort's direct supervisor, Mr. Speake, that he sent Ms. Pride-Fort home on September 10, 2015. Mr. Watkins did not notify Mr. Bush, Ms. Pride-Fort's general foreman at the time, that he sent Ms. Pride-Fort home on September 10, 2015. (Doc. 80, pp. 8–9). Still, because Mr. Watkins was not Ms. Pride-Fort's immediate supervisor, there is no evidence that he knew that Ms. Pride-Fort had used FMLA leave earlier in 2015, so his failure to alert HR or Ms. Pride-Fort's immediate supervisors that he

had sent Ms. Pride-Fort home is not evidence of retaliation for Ms. Pride-Fort's use of FMLA leave.

But the unrefuted evidence shows that when Mr. Speake sent Ms. Pride-Fort to HR on September 17, 2015, to discuss her points because she had pointed out, Ms. Heneghan told Ms. Pride-Fort that she received an attendance point for September 10 because she did not leave NAL by ambulance. (Doc. 79, pp. 14–15). The Court has found no evidence in the record that suggests that NAL's policy required Ms. Pride-Fort have left NAL by ambulance on September 10, 2015 to have HR excuse her absence. Though NAL may excuse an absence – Ms. Pride-Fort has three excused absences on her Kronos time record that pre-date her FMLA leave, (Doc. 71-12, pp. 3, 14 (February 13, 2014; February 26, 2015; and March 5, 2015); *see also* Doc. 71-12, p. 19 (showing 12.00 hours of excused time)) – there is no information in NAL's Hourly Team Member Guidebook that explains when NAL may excuse an absence.[13]

---

[13] As noted in the findings of fact, neither vacation/PAD/ETO nor various types of leave were available to Ms. Pride-Fort to cover her September 10 absence. NAL conducts "physical inventory over the Christmas holiday between . . . Christmas Eve and New Year's Day annually." (Doc. 78, p. 8, tp. 24). The Court credits Ms. Pride-Fort's testimony that she likely would have had to work over the 2015 holiday shutdown – her Kronos report confirms that she worked during the 2014 holiday period (Doc. 71-12, p. 12), so vacation days should have been available to her. But in September 2015, NAL was within its right to enforce its vacation policy that required Ms. Pride-Fort to have a reserve of 32-hours of vacation/PAD/ETO for the holiday season. According to Ms. Pride-Fort's termination paperwork, she had, at most, 31 hours when NAL terminated her employment. (Doc. 71-9). According to an EEOC document, Ms. Pride-Fort had 34.31 hours of vacation remaining when NAL fired her. (Doc. 74-11). Using the EEOC evidence, Ms. Pride-Fort would have fallen below 32 hours of vacation if she used more than two hours to cover her September 10 absence.

More troubling is the way in which HR terminated Ms. Pride-Fort. In his written termination report, Mr. Speake, Ms. Pride-Fort's immediate supervisor on the "production" side of NAL, marked her eligible for rehire. Mr. Speake indicated that Ms. Pride-Fort's knowledge of her job was excellent, and her cooperation, initiative, and quality of work were good. (Doc. 73-1, p. 1). Mr. Speake noted that Ms. Pride-Fort "pointed out at 7.5 points due to thinking" her September 10 and 11 absences "would be covered under FMLA." (Doc. 71-10). HR ultimately decided whether to deem Ms. Pride-Fort eligible or ineligible for rehire. (Doc. 80, p. 132). HR was supposed to collect input from the production team to make a decision regarding rehire eligibility. (Doc. 80, p. 132). There is no evidence that Ms. Heneghan contacted Mr. Speake, Ms. Pride-Fort's immediate supervisor, to ask about his recommendation for rehire. Ms. Heneghan called Mr. Bush, Ms. Pride-Fort's general foreman, on September 18, 2015 about Ms. Pride-Fort's attendance points but did not ask Mr. Bush if he believed that Ms. Pride-Fort was eligible for rehire. (Doc. 80, pp. 7, 177). Mr. Bush testified that he was willing to rehire Ms. Pride-Fort. (Doc. 80, p. 6). Ms. Heneghan deemed Ms. Pride-Fort ineligible for rehire. (Doc. 71-9, p. 1).

Though Ms. Heneghan marked Ms. Pride-Fort ineligible for rehire, Ms. Pride-Fort introduced no direct evidence that explains Ms. Heneghan's decision. Ms. Pride-Fort argues that she "is coded in the system as no rehire over absenteeism,"

but that overstates the evidence. (Doc. 80, p. 187). Ms. Heneghan indicated that the reason for Ms. Pride-Fort's termination was absenteeism. (Doc. 71-9). She separately indicated, on the same form, that Ms. Pride-Fort was not eligible for rehire. Absenteeism could relate to FMLA leave, but it also could relate to a total of more than seven attendance points for days that Ms. Pride-Fort was absent from work. The termination form does not explain why Ms. Heneghan overrode Mr. Speake's recommendation for rehire. By way of circumstantial evidence, it is undisputed that Ms. Heneghan studied Ms. Pride-Fort's FMLA usage just before she deemed Ms. Pride-Fort ineligible for rehire: on September 17, 2015, Ms. Heneghan recoded Ms. Pride-Fort's time from FMLA to unexcused, (Doc. 71-11), and on September 18, 2015, Ms. Heneghan signed Ms. Pride-Fort's termination report, indicating Ms. Pride-Fort was ineligible for rehire, (Doc. 71-9). But Ms. Heneghan may have coded Ms. Pride-Fort as ineligible for rehire because she believed that Ms. Pride-Fort had asked to have her September 2015 absences coded as FMLA leave, knowing that she already had exhausted her leave. The Court is left to speculate, and a verdict cannot rest on speculation.

Ms. Pride-Fort has proven that HR's "ineligible" for rehire designation is inconsistent with production's willingness to rehire her and that HR may not have adequately explored the question of rehire with Ms. Pride-Fort's superiors on NAL's production side, but she has not proven by a preponderance of the evidence that HR

designated her as ineligible for rehire because she exhausted her FMLA leave. Had Ms. Pride-Fort demonstrated that the vast majority of the other NAL employees terminated for absenteeism were eligible for rehire or had been rehired, she might have some evidence of intent. If the Court had heard testimony from Ms. Heneghan or another witness who worked in HR when NAL terminated Ms. Pride-Fort, the Court might have some evidence that would explain the factors that HR used to decide whether to deem an employee eligible or ineligible for rehire. There is no such evidence in the record. Ms. Pride-Fort proved that NAL's attendance point system was unwieldy and plagued with inconsistency and error, but that does not equate with intent to retaliate for FMLA leave. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1143 (11th Cir. 2020) (*en banc*) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).

Accordingly, the Court finds that Ms. Pride-Fort did not prove by a preponderance of the evidence that Ms. Heneghan's decision to mark Ms. Pride-Fort as ineligible for rehire was not retaliation for Ms. Pride-Fort's FMLA use.

## Conclusion

This was not an easy case to decide. It is troubling that NAL refused to excuse Ms. Pride-Fort's September 10 absence. Without that absence, she would not have pointed out on September 15. It also is troubling that HR trumped production's wish to designate Ms. Pride-Fort as eligible for rehire when the evidence indicates that

that Ms. Pride-Fort was a solid employee who had accumulated too many attendance points after several years of unblemished work.  But on the record before the Court, it is too difficult to connect the dots from which an inference of retaliatory intent might be drawn.  It is fair to say that NAL's decisions do not make sense, but the Court cannot make the leap from a set of illogical decisions to a finding of retaliatory intent without some evidence to bridge the significant gaps that exist in the record.[14] For the reasons explained above, the Court will enter judgment for NAL on Ms. Pride-Fort's FMLA retaliation claim and direct the Clerk to close this case.[15]

 **DONE** and **ORDERED** this June 28, 2021.

         _Madeline H. Haikala_
         _____
         **MADELINE HUGHES HAIKALA**
         UNITED STATES DISTRICT JUDGE

---

[14] As noted early in this opinion, Ms. Pride-Fort began this action with a host of claims.  Her FMLA retaliation claim may not have been her first choice strategically, and the evidence that she developed in discovery may have been focused on other claims.  That may explain the evidentiary gaps concerning Ms. Pride-Fort's FMLA retaliation claim.

[15] Still pending on the Court's docket is NAL's motion for judgment as a matter of law at the close of Ms. Pride-Fort's case.  (Doc. 70).  The Court denied that motion from the bench during trial.  (Day 2, p. 91).  The Court asks the Clerk to please term Doc. 70.